[No. H019424. Sixth Dist. Sept. 14, 2001.]

In re the Marriage of DAVID R. and IRIS M. FRASER CHERITON.
DAVID R. CHERITON, Respondent, v.
IRIS M. FRASER, Appellant.

COUNSEL

De Goff & Sherman, Richard Sherman; Law Offices of James T. Danaher and James T. Danaher for Appellant.

Law Offices of Bernard N. Wolf, Bernard N. Wolf; Baugh & Goodley and Bradford Baugh for Respondent.

OPINION

**WUNDERLICH, J.**—This is a marital dissolution action. At issue on appeal are child support, spousal support, and attorneys' fees. Because the trial court erred in setting support and in denying fees, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Appellant Iris M. Fraser (Iris) and respondent David R. Cheriton (David) were married in February 1980.[1] They have four children, all born between 1980 and 1988.

Iris performs and teaches music. David is a professor of computer science at Stanford University. David is also a researcher and an inventor. In addition, he works as a consultant to Cisco Systems, Inc. David's business relationship with Cisco began when he and a partner sold Cisco their business, Granite Systems, Inc. As a result of his work with Cisco, David received a substantial number of vested Cisco stock options, valued at more than $45 million as of the time of trial.[2]

---

[1]We refer to the parties by their given names for the sake of clarity; we intend no disrespect in doing so. (See *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707].)

[2]By the time of trial in May 1998, David had received vested options for nearly 590,000 shares of Cisco stock (after stock splits), with additional shares vesting monthly. In 1997, he exercised options for 300,000 shares of Cisco stock. According to David's offer of proof at trial, he continued to hold half of those 300,000 shares against an anticipated tax liability. David then sold the other 150,000 shares in 1997 at $65 per share, for a gross sales price of $9.75 million.

The precise amount that David netted from the 1997 sale of stock is unclear. David testified that "most" of the $9.75 million was used to pay taxes and attorneys' fees. According to his offer of proof, the sale proceeds "went to pay taxes" and to "pay off a margin account," which was established "to pay attorney's fees." When asked to clarify how much was left, David responded: "I think I have three million in other stock, and I have about 700,000 in cash that's to cover capital gains I'm expecting." But David's trial attorney asserted that the entire $9.75 million sale proceeds "went to back taxes. It's gone." In its findings, the trial court noted David's testimony that "the bulk of the cash received would go to taxes and attorney's fees" and concluded that he "had $3,000,000 left at the time of trial." According to his brief on appeal, David "continued to hold approximately $3,700,000 to cover a tax liability he was expecting."

In short, as of the time of trial, David retained $3 million or more in proceeds from his 1997 sale of 150,000 shares of Cisco stock, he still held the remaining 150,000 Cisco shares from his 1997 stock option exercise, and he continued to own options for nearly 290,000 additional Cisco shares. The court valued David's Cisco stock and options collectively at $45 million, based on the stock's trading price on May 19, 1998. (But see *In re Marriage of Harrison* (1986) 179 Cal.App.3d 1216, 1225, fn. 2 [225 Cal.Rptr. 234], which raises the question whether the value of an option is the same as the value of the underlying stock.)

In addition to his Cisco stock, David held stock options in a company called Shiva, which were valued at $300,000 to $400,000 at the time of trial. He also held stock in Hybrid Network, worth $232,500 just prior to trial. Though not mentioned at trial, the parties' stipulated property settlement judgment shows that David also held shares of an undisclosed value in Disney, Hollinger, LDDS Communications, Plum Creek Timber, and Seagram.

David's stock holdings were extensive, but Iris also held some Cisco stock, which she received in the parties' property settlement. In 1997, Iris exercised some of her options, and then sold those shares, apparently for a gross sales price of $302,500. At the time of trial, Iris still owned 14,000 postsplit shares of Cisco stock, which were then worth over $1 million.

Iris and David initially separated in 1986, but they reconciled in 1988. At the time of their reconciliation, the parties entered into a postnuptial agreement (the agreement). The agreement defined the parties' property rights. For the most part, future property acquisitions and earnings would constitute separate property under the agreement. The parties agreed that all of David's income would be his separate property, except his salary and employee benefits from Stanford University (or an equivalent position), while half of Iris's earnings would be community property. The agreement also required Iris to actively pursue employment to maximize her income, consistent with the needs of the parties' children. Although Iris subsequently challenged the agreement, its validity was upheld.

Iris and David separated again in 1994. David petitioned for dissolution of the marriage. The parties stipulated that David would pay temporary child support of $2,171 per month and temporary spousal support of $689 per month. Iris and the four children moved from the family residence into a small rented house. The children shared the bedrooms, while Iris slept in the living room on a sofa bed. David remained in the family home.

Eventually, the parties stipulated to a dissolution judgment, which was filed by the court in December 1997. The judgment resolved many issues in the parties' dissolution action, including the division of property. The judgment also required David to create a trust for the children, funded by Cisco stock, to provide for specified educational and housing needs.[3] Child support and spousal support issues were bifurcated for later trial, as was the issue of attorneys' fees incurred by Iris after November 20, 1997.

---

[3]With respect to housing, the pertinent part of the judgment provides as follows: "3. The trust shall provide $400,000 as a down payment for residence to be acquired and owned by the trust within the City of Palo Alto. Said residence shall be selected by [Iris]. The balance of the purchase price on the residence shall be provided by way of a commercial mortgage. Title to the house shall be in the name of the trust. [¶] 4. [Iris] shall be responsible for payment of the monthly costs for the residence, including, but not limited to, the principal, interest, real property taxes, homeowner's insurance, and maintenance. Regardless of actual expenses as outlined above while occupying this residence, in any support hearing, the Court may not consider a monthly housing cost of over $3,000."

Although the trust had not yet been established at the time of trial in May 1998, the trial court nevertheless gave effect to the foregoing provision in setting child support, saying this: "By the terms of the Judgment, the parties have limited the court's consideration of housing cost for [Iris] and the children to $3,000 per month. While [Iris] now contends that her housing costs may be substantially more than that . . . she and [David] agreed to the limitation on housing costs for support purposes and this Court is bound by that prior agreement and order."

In her opening brief on appeal, Iris asks us to take judicial notice that the trust still had not been established as of April 1999. David objects, arguing that Iris's references to subsequent events are improper. David's objection is well taken. "Except in rare cases where events subsequent to the ruling under review have rendered the case totally moot, we do not, and may not, consider subsequent events." (*In re Marriage of Jacobs* (1981) 126 Cal.App.3d 832,

In May 1998, a one-day trial was conducted on the reserved support and fee issues. The parties offered evidence and argument on the child support and spousal support issues. The trial judge closed the hearing at the end of the court day, indicating that she would "deem the matter submitted except for the issue of attorney's fees which we've submitted in writing."

In June 1998, the court issued a detailed statement of decision, to which Iris objected on various grounds. In July 1998, the court issued an amended statement of decision, which was consistent with its initial statement of decision in all material respects. In it, the court: (1) made findings with respect to David's income and assets, including his stock and stock options; (2) made findings regarding Iris's income and earning potential and her assets; (3) imputed income to Iris based on her earning potential; (4) considered the effect on support of the children's trust, which was to be created as part of the property settlement; (5) analyzed the marital standard of living; (6) refused to impute income based on the parties' ownership of stock options; (7) ordered David to pay child support of $2,292 per month for the four children; (8) established detailed procedures for future modifications of child support; (9) set spousal support for Iris at $2,000 per month with automatic reduction and termination provisions; and (10) ordered each side to bear its own attorneys' fees.

In October 1998, the court entered formal judgment consistent with the amended statement of decision. This appeal by Iris ensued.

## ISSUES ON APPEAL

Challenging specific aspects of the judgment, Iris claims that the trial court erred in setting child support and spousal support and in refusing to award her attorneys' fees. Her specific challenges to the judgment are discussed in detail below.

## STANDARD OF REVIEW

■ We apply the abuse of discretion standard to all of the issues presented.

First, child support awards are reviewed for abuse of discretion. (See, e.g., *In re Marriage of Wood* (1995) 37 Cal.App.4th 1059, 1066 [44 Cal.Rptr.2d 236]; *In re Marriage of Chandler* (1997) 60 Cal.App.4th 124, 128 [70 Cal.Rptr.2d 109].) We observe, however, that the trial court has "a duty to

835 [179 Cal.Rptr. 169].) For that reason, by separate order, we previously sustained David's objections to Iris's references to any material not contained in the appellate record.

exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . ." (*In re Marriage of Muldrow* (1976) 61 Cal.App.3d 327, 332 [132 Cal.Rptr. 48].) Furthermore, "in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]" (*In re Marriage of Butler & Gill* (1997) 53 Cal.App.4th 462, 465 [61 Cal.Rptr.2d 781].) In short, the trial court's discretion is not so broad that it "may ignore or contravene the purposes of the law regarding . . . child support. [Citations.]" (*County of Stanislaus v. Gibbs* (1997) 59 Cal.App.4th 1417, 1425 [69 Cal.Rptr.2d 819].)

We also apply the abuse of discretion standard in assessing Iris's challenges to the award of spousal support. "In awarding spousal support, the court must consider the mandatory guidelines of section 4320. Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.]" (*In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93 [91 Cal.Rptr.2d 374], fn. omitted.)

Finally, attorneys' fee awards in marital dissolution cases are also reviewed for an abuse of discretion. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1166 [62 Cal.Rptr.2d 466].)

### DISCUSSION

1. *Child Support.*

California has a strong public policy in favor of adequate child support. (See, e.g., *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1455 [89 Cal.Rptr.2d 874]; *Stewart v. Gomez* (1996) 47 Cal.App.4th 1748, 1754 [55 Cal.Rptr.2d 531].) That policy is expressed in statutes embodying the statewide uniform child support guideline. (See Fam. Code, §§ 4050-4076.)[4] "The guideline seeks to place the interests of children as the state's top priority." (§ 4053, subd. (e).) In setting guideline support, the courts are required to adhere to certain principles, including these: "A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life." (§ 4053, subd. (a).) "Each parent should pay for the support of the children according to his or her ability." (§ 4053, subd. (d).) "Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children." (§ 4053, subd. (f).)

---

[4]Further statutory references are to the Family Code unless otherwise specified.

To implement these policies, courts are required to calculate child support in accordance with the mathematical formula set forth in the statute. (See § 4055; see generally Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 6:165, p. 6-63; 2 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2001) Child Support Orders, § 41.05, p. 41-9.) Determining child support under the guidelines has been criticized as a "complex and unduly costly" process "which requires the use of a computer and which is not understood by anyone, least of all the affected parties." (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1040-1041 [31 Cal.Rptr.2d 749].)[5] Nevertheless, adherence to the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes. (§§ 4052, 4053, subd. (k); *County of Stanislaus v. Gibbs, supra,* 59 Cal.App.4th at p. 1419.) Those special circumstances include a parent's extraordinarily high income. (§ 4057, subd. (b)(3); *Johnson v. Superior Court* (1998) 66 Cal.App.4th 68, 72 [77 Cal.Rptr.2d 624]; *McGinley v. Herman* (1996) 50 Cal.App.4th 936, 938 [57 Cal.Rptr.2d 921].)

With that background in mind, we turn to the specific child support issues that Iris raises in this case.

a. *Did the trial court err in failing to account for David's wealth in setting child support?*

■ Iris argues generally that the trial court abused its discretion to the extent its order precluded the children from sharing in David's wealth. That proposition finds some support in the cases. Thus, in one case, a trial court

_____

[5]The guideline calculations have come in for even more colorful judicial criticism recently. As one court put it, "the algebraically based computation method has been likened to something out of Alice in Wonderland. Actually, it is worse than that. The system is a kind of hybrid of quantum physics and Zen philosophy. Support is calculated on after-tax income, but after-tax income may be *itself* affected by the support order! Thus, in a manner reminiscent of an attempt to pin down an electron or the image of a snake eating its own tail, the nooks and crannies of the computer program involved in this case contain sophisticated feedback loops which seek, in essence, to continually adjust for the tax effects of a given order, but at the same time formulate an order in light of those same tax effects. . . . For a judge trying to manually apply the law, it would be like taking an algebra exam after doing somebody else's tax returns." (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 523-524, fn. 2 [70 Cal.Rptr.2d 488].) Other courts also have joined the chorus of criticism. (See *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 144 [61 Cal.Rptr.2d 559] ["For better or worse, California child support law now resembles determinate sentencing in the criminal law . . . . [¶] . . . [¶] . . . Certain sections of the Family Code are now redolent of the flavor of the Internal Revenue Code . . . ."]; and see *In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 316, 317, 319 [96 Cal.Rptr.2d 772] ["California's child support statutes are a legal world unto themselves." "The statute virtually beckons the eyes to glaze over." An "aura of occult wizardry surround[s] the algebraic formula . . . ."].)

was found to have "abused its discretion by depriving the child of his right to share in his father's unusual wealth." (*In re Marriage of Hubner* (1988) 205 Cal.App.3d 660, 667 [252 Cal.Rptr. 428] [decided under the predecessor statute, the Agnos Act]; see also *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 54 [272 Cal.Rptr. 560] [same].) In another case, a trial court was reversed for an abuse of discretion when it failed to "give sufficient consideration to the child's right to share in the standard of living of his extraordinarily high earning father." (*McGinley v. Herman, supra,* 50 Cal.App.4th at p. 945; see also *County of Alameda v. Johnson* (1994) 28 Cal.App.4th 259, 264 [33 Cal.Rptr.2d 483] [Where a father's "income is substantial," his child "is entitled to share in his standard of living."].)

Building on her general argument, Iris challenges the child support order on several particular grounds. She first takes issue with the trial court's decision to exclude the proceeds from David's 1997 sale of Cisco stock from the child support calculation.

(i) *Proceeds of the stock sale.*

In her attack on the trial court's treatment of David's 1997 stock sale proceeds, Iris first asserts that the entire net proceeds from the sale constitute income to David for purposes of child support.

In considering this issue, we begin by observing that income is broadly defined for purposes of child support. (*In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150, 154 [90 Cal.Rptr.2d 159]; *Stewart v. Gomez, supra,* 47 Cal.App.4th at p. 1753; accord, *In re Marriage of Rine* (1993) 18 Cal.App.4th 953, 958 [23 Cal.Rptr.2d 10] [decided under the Agnos Act]; see generally Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶¶ 6:197-6:201, pp. 6-79 to 6-80.) Subject to certain statutory exceptions, which do not apply here, gross income "means income from whatever source derived . . . ." (§ 4058, subd. (a).) Although it specifically lists more than a dozen possible income sources, by the statute's express terms, that list is not exhaustive. (*Ibid.*; and see *County of Contra Costa v. Lemon* (1988) 205 Cal.App.3d 683, 688 [252 Cal.Rptr. 455] [decided under Agnos Act].) Rather, the codified income items "are *by way of illustration* only. Income from other sources . . . should properly be factored into the 'annual gross income' computation. [Citations.]" (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 6:201, pp. 6-79 to 6-80, original italics.)

The judicially recognized sources of income cover a wide gamut. (See, e.g., *County of Placer v. Andrade* (1997) 55 Cal.App.4th 1393, 1397 [64 Cal.Rptr.2d 739] [predictable overtime and bonuses must be included in

prospective income under § 4060]; *In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 52 [future bonuses are properly considered income]; *Stewart v. Gomez, supra,* 47 Cal.App.4th at pp. 1754-1755 [reasonable value of rent-free housing is income]; *In re Marriage of Schulze, supra,* 60 Cal.App.4th at pp. 529-530 [company car and parent-employers' rent subsidy constitute income]; *County of Contra Costa v. Lemon, supra,* 205 Cal.App.3d at p. 689 [in welfare case, lottery winnings are considered income]; see also *County of Kern v. Castle, supra,* 75 Cal.App.4th at p. 1453 [trial court may treat inheritance as income in its discretion]; cf. *In re Marriage of Schulze, supra,* 60 Cal.App.4th at p. 529 [gifts are not income (dicta)]; *In re Marriage of Rocha* (1998) 68 Cal.App.4th 514, 517 [80 Cal.Rptr.2d 376] [student loan is not income because it must be repaid].)

As pertinent here, income includes stock options granted as part of a parent's compensation.[6] (*In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 96.) Thus, where a parent enjoys "substantial income in addition to his salary and bonuses in the form of stock options," "[t]his additional income is part of his overall employment compensation and must be used to calculate child support. [Citation.]" (*Ibid.*)

Iris argues that the trial court ignored the money David received from his 1997 sale of Cisco stock in making its child support order. David disputes that contention. He refers us to the court's amended statement of decision, which recites that both he and Iris "had substantial income from options in 1997 . . . ." We first observe that the quoted reference appears in the court's discussion of retroactivity of its permanent child support order, not in its findings regarding the parties' income. More to the point, while the trial judge was quite obviously aware that David had netted millions of dollars from the sale of a portion of his stocks in 1997, she did not factor those funds into the child support formula. The court also apparently failed to

---

[6]On the nature of stock options generally, see *In re Marriage of Walker* (1989) 216 Cal.App.3d 644, 648-651 [265 Cal.Rptr. 32]; *In re Marriage of Harrison, supra,* 179 Cal.App.3d at pages 1224-1227; *In re Marriage of Nelson* (1986) 177 Cal.App.3d 150, 153-155 [222 Cal.Rptr. 790]; *In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 784-786 [201 Cal.Rptr. 676, 46 A.L.R.4th 623]. All four of those cases involved the characterization of stock options as separate or community property upon dissolution. In the *Hug* case, the court observed that "there is no compelling reason to require that employee stock options must always be classified as compensation exclusively for past, present, or future services. Rather, since the purposes underlying stock options differ, reference to the facts of each particular case must be made to reveal the features and implications of a particular employee stock option." (*In re Marriage of Hug, supra,* 154 Cal.App.3d at p. 784.) There, the court adopted a time rule for allocation, but it took pains to "stress that no single rule or formula is applicable to every dissolution case involving employee stock options." (*Id.* at p. 792.)

include certain other items in calculating David's gross income, which are far less significant in amount than the proceeds from his 1997 stock sale.[7]

David also maintains that he is not receiving incentive stock options as part of his ongoing compensation. Therefore, he argues, "even if an employee's receipt of stock options might be deemed income for the purposes of support in some other factual setting, this consideration is not pertinent in the instant matter." We disagree. First, David's attorney conceded at trial that he received the options "as compensation for work." Additionally, there is no evidence in the record to support David's factual assertion that stock options are not part of his current compensation package. Finally, even assuming David is no longer receiving stock options from Cisco, those he already owns may be subject to his child support obligation, as we discuss below.

We recognize that certain difficulties inhere in calculating support based on income from stock options. For one thing, such income may be sporadic. That impediment does not justify excluding such income from the calculation, however. (Cf., *County of Placer v. Andrade, supra,* 55 Cal.App.4th at p. 1396: "The court cannot deduct predictable overtime and bonuses in determining [father's] prospective earnings merely because they occur sporadically.") Furthermore, the Legislature specifically provided the means for overcoming that particular obstacle. Trial courts are permitted to adjust the award where the guideline "monthly net disposable income figure does not accurately reflect the actual or prospective earnings of the parties." (§ 4060.) In addition, trial courts have discretion to "adjust the child support order as appropriate to accommodate seasonal or fluctuating income." (§ 4064.)

---

[7]For reasons that are not explained in the record or the parties' initial briefs, the court also apparently failed to include certain other items in calculating David's gross income. Although those items are not significant in amount in the context of this case, we nevertheless requested additional briefing on this issue. From the record and the parties' supplemental letter briefs, it appears that the court excluded a one-time honorarium of $1,000 that David earned in 1997. More significantly, it appears from the DissoMaster printout that the court also excluded David's ongoing royalty, dividend, and interest income in calculating child support. According to David's offer of proof at trial, adopted in the trial court's findings as to this point, that income was estimated at $1,870 per month in 1997; the estimate was based on declining V-system royalties of $20,000 per year together with combined dividend and interest income of $203 per month. David's documentary evidence at trial shows his combined royalty, dividend, and interest income was actually higher. V-system royalties earned him $21,381 in 1997, down from $26,000 per year earlier. In addition, David had 17 bank, credit union, or investment accounts, as well as stock holdings in other companies besides Cisco. David's documentary evidence indicated that he averaged $254 per month (not $203 per month) in combined interest and dividend income in 1997 from just three of those 17 accounts: a Eureka bank account, a Stanford credit union account, and a Schwab investment account. Notwithstanding David's contentions to the contrary, whatever sum David actually received in income from royalties, dividends, and interest, that amount appears to have been excluded in calculating his gross income for child support purposes, without explanation by the trial court for its exclusion.

There is a second, perhaps thornier obstacle that trial courts face in incorporating stock option income into the child support calculation. That difficulty lies in determining *when* stock options become income for purposes of child support. To some extent, that determination may turn on the nature of the options themselves. (Cf. *In re Marriage of Harrison, supra,* 179 Cal.App.3d at pp. 1224-1225 [in property division, nonqualified options were vested, even though the underlying stock was subject to forfeiture]; *Cooper v. Cooper* (1969) 269 Cal.App.2d 6, 11-12 [74 Cal.Rptr. 439] [in property division, matured but unexercised stock options were not mere expectancy].) Federal income tax law may also affect the determination. (See, e.g., *In re Marriage of Schulze, supra,* 60 Cal.App.4th at pp. 529-530 and fn. 11, which discusses the interplay between income for purposes of the federal tax code and income under the child support statutes; but see also Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 6:208.2, p. 6-86; and cf. *In re Marriage of Nelson, supra,* 177 Cal.App.3d at pp. 155-156, which discusses the income taxation of stock options for purposes of division upon marital dissolution; on federal taxation of stock options, see generally 26 U.S.C.A. §§ 421-425.) Under California's child support statutes, as under federal tax law, the employee-parent may realize income at the time an option is exercised.[8] (See *In re Marriage of Kerr, supra,* 77 Cal.App.4th at pp. 91-92, 95 [which involved incentive stock options and nonqualified stock options; there, the support order was "based on a percentage of income once the stock options were exercised, and a financial gain was realized"]; cf. *Murray v. Murray* (1999) 128 Ohio App.3d 662 [716 N.E.2d 288, 293] [for purposes of Ohio's child support statute, parent's gross income includes the appreciation in value of his unexercised employee stock options].) At the very latest, though, income is realized when the underlying stock is sold for a gain. (Cf. *In re Marriage of Walker, supra,* 216 Cal.App.3d at p. 651.)

In this case, the trial judge concluded that the stock options "certainly can become income upon exercise and again upon sale, but until that occurs, they are not income available for support." We agree with the court's conclusion that any proceeds from the sale of stock constitute "income available for support," after accounting for allowable deductions.[9] Unfortunately, the court did not apply that conclusion to David's 1997 exercise of

---

[8]Here, for example, there was evidence that David's "stock options when they are exercised show up on his W-2s." As David's accountant testified at trial, alternative minimum tax liability can be generated in the year of exercise, but neither vesting nor exercise of incentive stock options otherwise constitutes a taxable event. (Cf. *Commissioner v. LoBUE* (1956) 351 U.S. 243, 249 [76 S.Ct. 800, 804, 100 L.Ed. 1142] [receipt of stock options can trigger immediate taxable gain].)

[9]Allowable deductions clearly include taxes. We question the propriety of permitting a deduction for attorneys' fees, however. "Section 4059 governs calculation of 'net disposable

options and sale of stock, from which he grossed some $9.75 million.[10] Instead, the trial court expressly excluded those proceeds from the child support formula, by the expedient of refusing to modify support retroactively to 1997. The court cited these reasons for its decision: "the parties were in the midst of their property division, had extensive attorney's fees and tax obligations, and [David] paid support . . . in accordance with the temporary support orders . . . ." We find those justifications unpersuasive, particularly in light of California's well-established policies requiring parents to support their children according to their ability. (§ 4053, subd. (d).)

Given the broad statutory definition of income, we conclude that the entire amount David received from the 1997 sale of his Cisco stock, subject to permissible deductions, constitutes gross income for purposes of section 4058, subdivision (a)(1).[11] In view of our conclusion, we need not and do not reach Iris's alternative argument that the trial court erred in failing to impute income to David on the proceeds from his 1997 stock sale.

(ii) *David's assets.*

█ Iris's next attack on the order is based on the trial court's refusal to consider David's assets in determining child support. As noted above, as of the time of trial, David's assets included stock and options worth tens of

---

income.' The calculation subtracts *nondiscretionary expenses* from gross income to reach 'net disposable income.' The subtracted expenses include state and federal taxes, employer deductions for a pension plan, mandatory union dues, and child or spousal support paid under court order. Only these *unavoidable* parental expenses are included in the formula. The Legislature recognized that these expenses *must* be paid, reducing parental ability to pay child support. However, other, discretionary parental expenses are not reflected in the formula." (*In re Marriage of C.* (1997) 57 Cal.App.4th 1100, 1105-1106 [67 Cal.Rptr.2d 508], original italics.)

[10]We are mindful that both David and Iris received income from stock sales in 1997. (See fn. 2, *ante.*) Even so, we find David's stock sale more significant here for several reasons. First, there is a substantial disparity in the amount of money realized by each party from stock sales that year. According to the court's findings, Iris received "$302,500, which is taxable income to her for 1997." Thus Iris's *gross* proceeds amounted to a mere fraction of the $3 million or more that David *netted.* Furthermore, although both parents' incomes figure into the child support calculation, we primarily focus here on David's income, as the payor spouse. Finally, since David earned the stock options as part of his compensation package, their entire value constitutes income to him. By contrast, in exercising her options and then selling her stock, Iris was liquidating a principal asset that she received in the property settlement. (Cf. *In re Marriage of Rabkin* (1986) 179 Cal.App.3d 1071, 1080-1082 [225 Cal.Rptr. 219].) Thus, for a number of reasons, Iris's 1997 sale of stock stands on a different footing from David's.

[11]We acknowledge that it may be appropriate to allocate some of those proceeds to other periods besides the year of receipt. (See §§ 4060, 4064; cf. cases cited at fn. 6, *ante.*) To the extent that such a determination may require taking evidence, it is not an appropriate appellate function. We therefore leave that determination to the trial court on remand.

millions of dollars, principally from Cisco. The court concluded that those assets "are not income as defined in the code sections that relate to child support." Iris assigns that conclusion as error. Not surprisingly, David disagrees. He argues that the "child support guidelines are based exclusively on income, not assets."

As a general proposition, we agree that the "key financial factor in the guideline formula is net disposable income. [Citations.]" (*Johnson v. Superior Court, supra,* 66 Cal.App.4th at p. 75.) Nevertheless, relevant authority at least suggests that wealth is an appropriate consideration in setting child support. By statute, parents are required to provide child support according to their "ability," their "circumstances and station in life," and their "standard of living." (§ 4053, subds. (d), (a), (f).) It is fair to assume that in most cases assets contribute to the ability to provide support. (Cf. § 4320, subd. (c): for purposes of *spousal* support, considerations include the "*ability to pay* of the supporting party, taking into account the supporting party's earning capacity, earned and unearned income, *assets*, and standard of living" [Italics added.].)

Like its statutes, California's case law inferentially supports the consideration of assets in setting child support.[12] For example, several cases cite a parent's "wealth" or "net worth" in connection with child support awards. (See, e.g., *In re Marriage of Hubner, supra,* 205 Cal.App.3d at p. 667; *White v. Marciano* (1987) 190 Cal.App.3d 1026, 1032 [235 Cal.Rptr. 779].) Other cases discuss the significance of the parents' "lifestyle." (See, e.g., *In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 555 [251 Cal.Rptr. 370].) Still other decisions, in discussing lifestyle, mention the parent's "financial resources" available for child support. (See, e.g., *Johnson v. Superior Court, supra,* 66 Cal.App.4th at p. 76; cf. *State of Oregon v. Vargas* (1999) 70 Cal.App.4th 1123, 1128 [83 Cal.Rptr.2d 229] [court must consider whether incarcerated parent "has assets, income, or employment possibilities, which will enable him to meet his current child support obligation, either in whole or in part"].) In one case, the reviewing court found an abuse of discretion

---

[12]Many sister state decisions directly hold that the supporting parent's assets should be considered in setting child support. (See Annot., Excessiveness or Adequacy of Money Awarded as Child Support (1984) 27 A.L.R.4th 864, 880-881, § 4, and later cases (2001 supp.) pp. 113-115.) Of the jurisdictions that have considered the issue, all have required or approved the consideration of assets in calculating child support. (*Ibid.*) A recent Ohio case held that stock options constitute income for purposes of that state's child support statute, which, like California's, broadly defines "gross income." (*Murray v. Murray, supra,* 716 N.E.2d 288.) The Ohio court said this: "If we were to hold that executive stock options were not to be included in 'gross income' . . . , an employee receiving such options would be able to shield a significant portion of his income from the courts, and deprive his children of the standard of living they would otherwise enjoy. This would be in direct contradiction of the very purpose of the child support statute, the child's best interest." (*Id.* at p. 294.)

where the trial court failed "to take into account . . . husband's conceded wealth." (*In re Marriage of Catalano, supra,* 204 Cal.App.3d at p. 555.) There, the court cited the husband's "numerous automobiles, including a Rolls Royce, and at least two residences." (*Ibid.*; cf. *In re Marriage of C., supra,* 57 Cal.App.4th at pp. 1106-1107 [father's ownership of $55,000 in liquid assets militates against finding the high guideline figure unjust].)

A recent case involved the receipt of a million-dollar inheritance by the father, who was a child support payor. (*County of Kern v. Castle, supra,* 75 Cal.App.4th 1442.) The trial court in that case failed to consider the father's inheritance in setting support. The Fifth District Court of Appeal criticized the resulting order, finding that it did not permit the child "to share in her father's good fortune of having inherited a tremendous amount of money and real property assets." (*Id.* at p. 1456.) As the appellate court observed, "under the current support order, [the child] will not benefit from the substantial assets [her father] received. There is no basis for concluding this was somehow in her best interests. The court failed to articulate any reasons why this would be so." (*Ibid.*) The appellate court also observed that the trial court "did not consider any of the lump-sum inheritance of $240,000 as an income resource, as it had discretion to do. [Citation.] Further, after [the father] spent the entire sum between hearing dates, the trial court did not impute interest income . . . that the sum could have earned if invested, which the court recognized it had discretion to do. [Citations.] In addition, the court did not take into account [his] reduction in living expenses as a result of his having paid off his mortgage with the inheritance sum." (*Id.* at p. 1455.) As relevant to the analysis here, the court also said this: "Regarding the lump-sum inheritance, the only basis for not considering it as income or an available resource was the court's conclusion that it constituted property and not income. It is unclear whether the court recognized that it could discretionarily consider a lump-sum inheritance consistent with the policies of section 4053. To the extent it did not, a remand is appropriate. To the extent the court realized it had discretion, the finding the inheritance was property and not income is no reason to not consider it." (*Ibid.*)

Another recent California case also supports the consideration of a parent's assets in setting child support, at least to the extent that those assets can produce income. (*In re Marriage of Dacumos, supra,* 76 Cal.App.4th at p. 154.) There, the trial court imputed rental income to the father, based on the fair market value of his real property and his net equity in it, despite the fact that those rental properties were actually losing money. In affirming, the Third District Court of Appeal broadly defined earning capacity under section 4058, subdivision (b), "to include income that could be derived from income-producing assets as well as from work . . . ." (*In re Marriage of*

*Dacumos, supra,* at pp. 154-155.) "Just as a parent cannot shirk his parental obligations by reducing his earning capacity through unemployment or underemployment, he cannot shirk the obligation to support his child by underutilizing income-producing assets." (*Id.* at p. 155; see also *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385 [111 Cal.Rptr.2d 487]; cf. *In re Marriage of Kennedy* (1987) 193 Cal.App.3d 1633, 1640, fn. 3 [239 Cal.Rptr. 151], a spousal support case, which suggested in dicta that the trial court lacked authority to order the payee spouse to invest in income-producing property; cf. also *In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373, 1380 [74 Cal.Rptr.2d 636], which held that the husband could not be ordered to exhaust or invade the principal of his retirement assets to pay spousal support.)

In this case, the trial court's refusal to consider David's substantial wealth in setting child support effectively permits him to avoid his obligation to support his children according to his "ability," his "circumstances and station in life," and his "standard of living."[13] (§ 4053, subds. (d), (a), (f).) Thus, "under the current support order, [the children] will not benefit from the substantial assets [their father] received. There is no basis for concluding this was somehow in [their] best interests." (*County of Kern v. Castle, supra,* 75 Cal.App.4th at p. 1456.) The challenged child support order thus offends the statutory policies of this state.

We are mindful that trial courts are invested with substantial discretion in this area, and that no California authority expressly mandates the consideration of a parent's assets in awarding child support. Nevertheless, under the circumstances present here, we conclude that the trial court's refusal to consider David's substantial wealth in setting child support may have resulted in an order that is too low to be in the best interests of his children, based on an assessment of their reasonable needs. (See § 4053, subd. (e).) At the very least, the trial court should consider imputing reasonable income on David's assets, pursuant to section 4058, subdivision (b), to the extent necessary to meet the children's reasonable needs. (*In re Marriage of Dacumos, supra,* 76 Cal.App.4th at pp. 155-156.)

In view of our conclusion, we do not reach Iris's alternative contention that David's wealth is a special circumstance under section 4057.

---

[13]By all accounts, David lives very modestly, maintaining a standard of living far below his means. Nevertheless, as the trial court correctly recognized in its statement of decision, the children's right "to share in the lifestyle of the high earner . . . is not necessarily constrained by the fact that [he] chooses to spend little on 'lifestyle.' " We agree that "lifestyle should be evaluated based on the financial resources available to the payor parent, not whether he or she lives in a manner consistent with extravagance or with frugality." (*Johnson v. Superior Court, supra,* 66 Cal.App.4th at p. 76; accord, *White v. Marciano, supra,* 190 Cal.App.3d at p. 1032.)

b. *Did the trial court err in determining the reasonable needs of the children?*

■ In this case, the court explained its assessment of the children's needs as follows: "After carefully reviewing the series of Income and Expense Declarations filed by [Iris], the Court estimates the expenses of the children, as apart from [Iris's] expenses . . . , and excluding those items which will be paid from the trust, to be between $3,000 and $5,000."

Iris asserts that there are several significant flaws in the court's analysis of the children's needs. In addressing Iris's claim on the merits, we necessarily reject David's contention that Iris failed to object to the court's determination of this issue below. In Iris's objections to the court's statement of decision, she specifically took issue with "the Court's view of the level of expenses of the children." Procedurally, we find this objection adequate to preserve the issue for appeal. Substantively, we agree with Iris that the court's determination of the children's needs is flawed, as we explain below.

First, the court's analysis assumes that the children's historic expenses define their needs. But that assumption is erroneous in the case of wealthy parents, because it ignores the well-established principle that the "child's need is measured by the parents' current station in life." (*In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 96; accord, *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 129; *McGinley v. Herman, supra,* 50 Cal.App.4th at pp. 944-945; see generally Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶¶ 6:402-6:408, pp. 6-166 to 6-169.) "Clearly where the child has a wealthy parent, that child is entitled to, and therefore 'needs' something more than the bare necessities of life." (*White v. Marciano, supra,* 190 Cal.App.3d at p. 1032.)

Moreover, it appears that the court calculated the children's needs by determining the household's overall expenses, then deducting expenditures attributable to Iris. That method is improper. "It is error . . . to calculate the child's needs by attributing specified monthly expenses to the custodial parent and subtracting that sum from the custodial household's total monthly expenses." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 6:259e, pp. 6-108.4 to 6-109, citing *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 128.)

In addition, the court determined the children's needs by "excluding those items which will be paid from the trust." The court's reliance on the trust was error. (See *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 128 ["We doubt it is ever appropriate to employ a trust when ordering a parent to

pay child support, particularly one which, in part, places the custodial parent under the fiscal control of the supporting parent. But even assuming a trust can be used, it must be limited to cases where there is a strong showing of necessity, buttressed by specific, detailed factual findings compelling the need to limit access to support funds."].) In this case, it was particularly inappropriate to consider any benefit from the trust, since the trust was still inchoate at the time of the order and thus was not paying any of the children's housing or other costs.[14]

Finally, the court was mistaken when it concluded that it was bound by the parties' stipulated judgment, which ostensibly capped the custodial household's housing costs at $3,000 per month.[15] In the first place, the factual predicate for application of that restriction did not exist. The relevant portion of the judgment, with our emphasis added, provides as follows: "Regardless of actual expenses . . . *while occupying this residence*, . . . the Court may not consider a monthly housing cost of over $3,000." Obviously, Iris and the children were not occupying the referenced residence: it had not yet been acquired by the still-nonexistent trust. But even assuming that the stipulation would apply under the facts presented here, its cap on housing costs is unenforceable to the extent it adversely affects the children's housing needs. "The stipulation of the parties, unless it is tantamount to an agreed statement of facts on which the portion of the decree relating to custody, maintenance and education of the children is based, does not divest the court of authority to modify child support. [Citation.] Any proper modification of the decree, may, in consideration of the best interest and welfare of the children [citation], be ordered on application of the mother, despite her previous agreement limiting the father's obligation for support. [Citations.]" (*Singer v. Singer* (1970) 7 Cal.App.3d 807, 812 [87 Cal.Rptr. 42].) "Parents do not have the power to agree between themselves to abridge their child's right to support. [Citation.]" (*In re Marriage of Lusby* (1998) 64 Cal.App.4th 459, 469 [75 Cal.Rptr.2d 263].) That is because "the law puts the child's interests before the contractual expectations of the parents. Courts will not respect agreements that have the effect of contracting away the child's right to support. [Citations.]" (*In re Marriage of Catalano, supra,* 204 Cal.App.3d at p. 552; accord, *In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 243 [269 Cal.Rptr. 388]; see also *In re Marriage of Lambe & Meehan* (1995) 37 Cal.App.4th 388, 392 [44 Cal.Rptr.2d 641], and cases cited therein; and see

[14]At trial, Iris made an offer of proof that she had advanced funds to cover certain educational and health expenses of the children, for which she hoped to obtain reimbursement from the trust. She also proffered evidence that the amounts she had advanced represented an increase in the household's monthly expenses beyond those indicated in the income and expense declaration she had most recently filed with the court.

[15]Iris offered evidence at trial that housing costs had increased and her anticipated mortgage payment would exceed $4,400 per month.

§ 1612, subd. (b) ["The right of a child to support may not be adversely affected by a premarital agreement."].)

Given the flaws in the trial court's determination of the children's needs, we conclude that remand is necessary on this issue. On remand, the trial court must properly determine the children's needs, with due regard to both parents' income and wealth.

c. *Did the trial court err in establishing its novel procedure for calculating future child support?*

■ As part of its order and judgment, the trial court ordered the parties to submit to a novel procedure for modifying base child support from year to year in the event there are changes in the parties' incomes. In its statement of decision, the court made clear its motivation for doing so: "Insofar as the parties both have fluctuating income, the Court must find a method to deal with interest, dividend, capital gain, or bonus income. To fail to deal with this in this case would condemn the parties to annual, if not more often, modification motions. Each of them has stock options which are presently exercisable. Each may, over time, exercise the options and create substantial income, as well as interest income on the proceeds. Income may change literally monthly."

Pursuant to the court's order, in June of each year, the parties are required to exchange copies of their tax returns or other proof of income for the prior year. The parties must then meet and confer to revise guideline support based on any changes in either parent's income, using an authorized computer program and experts if desired. Any resulting arrearages are payable by September 1, retroactive to January 1. Income that exceeds $350,000 in any given year is ignored in the calculation, subject to challenge by motion.

Iris attacks the court's methodology on several substantive grounds. In response, David first asserts a procedural argument: that Iris waived any claim of error with respect to the procedure, having failed to object to it below. We reject that assertion. Iris interposed 24 objections to the statement of decision, of which three were directed at the methodology for recalculating support. Substantively, David contends that Iris is not prejudiced by the trial court's approach, since it potentially avoids further disputes, thereby furthering the policy " 'to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.' " (§§ 271, 4053, subd. (j).)

However laudable the trial court's objectives, we agree with Iris that the procedure it employed for recalculating support is flawed. (Cf. *In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 97.) Several aspects of the order trouble us. We first consider those that Iris has raised.

Iris's first objection to the court's methodology rests on her contention that the procedure leaves David in control of his income and, therefore, of his support obligation. (Cf. *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 128.) According to Iris, David need not generate any additional income by selling stock, because he still has millions of dollars from his 1997 stock sale. To the extent that Iris's contentions rely on conjecture about what David might do in the future, we cannot accord them any weight. However, to the extent that the record supports her factual assumptions about David's need to sell stock, Iris's objection is well taken.[16] But we need not determine whether that objection alone would be sufficient to overturn the modification procedure, since it suffers from other flaws, which do require reversal.

Iris next attacks the methodology on the ground that it might result in a decrease in child support, in the event her income goes up as a result of invading capital while David's income remains static.[17] In our view, the possibility that the payor's support obligation will decrease if the payee's income increases is not objectionable per se. In fact, by taking both parents' incomes into account, the statute contemplates it. (§ 4055.) Nevertheless, in this case, it appears that the effect of the court's approach would be to minimize the true disparity in the parties' respective incomes. (See *In re Marriage of Catalano, supra,* 204 Cal.App.3d at p. 556 [The fact that "wife may still have to invade capital in order to maintain the house" is among the "factors that favor using the tremendous disparity between husband's and wife's incomes to increase the [child support] award to a level beyond proven expenses."]; see also *In re Marriage of Young* (1990) 224 Cal.App.3d 147, 154 [273 Cal.Rptr. 495] [disparity in parents' income supports increased child support award]; cf. *In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1081 [100 Cal.Rptr.2d 242] [disparity in income alone does not justify spousal support award].)

Iris also complains that any upward modification in support will not be paid timely under the court's plan. (See § 4053, subd. (*l*) ["Child support orders must ensure that children actually receive fair, timely, and sufficient support . . . ."].) As noted above, the court's methodology contemplates that any increase in support for a year in which income rises will be payable by September 1, retroactive to the beginning of the year. We share Iris's concern that child support arrearages are a built-in feature of the court's

---

[16]Those facts would include David's own modest living expenses and the funds he has available to meet them.

[17]We agree with Iris's observation that support may actually decrease under the court's approach. For that reason, we do not adopt David's characterization of the court's plan as one for "additional support."

methodology. Nevertheless, we recognize that as a practical matter, the timeliness of any increased support payments frequently will be an issue in modification motions. For that reason, we are not persuaded that this feature of the court's approach, standing alone, is a fatal one.

Iris's final point of contention on this issue arises from the $350,000 income ceiling that the trial court established for support modification. According to Iris, David failed to offer any evidence that $350,000 constitutes extraordinarily high income in this case. As the high earner, it is David's burden to rebut the guideline amount with a showing that it exceeds his children's reasonable needs. (§ 4057, subd. (b)(3); see *McGinley v. Herman, supra,* 50 Cal.App.4th at pp. 945-946.) ■ Because the definition of extraordinarily high income is tied to the children's needs in each instance, the evidentiary focus must be on the children's needs and not on the absolute amount of the parent's income. (Cf. *Estevez v. Superior Court* (1994) 22 Cal.App.4th 423, 429-430 [27 Cal.Rptr.2d 470].) What constitutes extraordinarily high income also may vary from one geographical area of the state to another. (See 2 Kirkland et al., Cal. Family Law: Practice and Procedure, *supra,* Child Support Orders, § 41.08[4], pp. 41-31 to 41-32.) As the trial court correctly observed in this case: "The legislature did not define the term extraordinarily high income, leaving that to the discretion of the trial court." In exercising that discretion, however, the trial court must at least approximate the point at which the guideline support obligation due from a high earner would exceed the children's needs. (*McGinley v. Herman, supra,* 50 Cal.App.4th at p. 945.)

■ Here, as the trial court quite properly noted: "The children in this case are entitled to share in the lifestyle of the high earner." The court then stated that it must "look to what the reasonable expenses for the children are, given all of the facts in the case." As the court explained: "After carefully reviewing the series of Income and Expense Declarations filed by [Iris], the Court estimates the expenses of the children, as apart from [Iris's] expenses . . . , and excluding those items which will be paid from the trust, to be between $3,000 and $5,000. The reason for the range of numbers is that the expenses will probably vary depending upon the incomes available to expend." In explaining its conclusion that annual income in excess of $350,000 is extraordinarily high, the court said this: "Support generated at that level of income under the guidelines would equal the highest number in the range of expenses of the needs of the children as set forth above." The court's reasoning, while otherwise persuasive, assumes that the children's needs are defined by their expenses. Where the children of a high earner are involved, however, this is not always so. (See, e.g., *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 129; *McGinley v. Herman, supra,* 50 Cal.App.4th at pp.

944-945.) Thus, the court erred to the extent that it based the $350,000 income ceiling on the children's expenses rather than their needs.

■ Beyond the objections that Iris raises, we have some concerns of our own about the trial court's novel methodology. For one thing, it circumvents the statutory procedures for modification of child support. (See §§ 3650-3693.) Those procedures require a party to introduce admissible evidence of changed circumstances as a necessary predicate for modification. (See, e.g., *In re Marriage of Popenhager* (1979) 99 Cal.App.3d 514, 521 [160 Cal.Rptr. 379] [child support modification requires changed circumstances]; cf. *In re Marriage of Mulhern* (1973) 29 Cal.App.3d 988, 992 [106 Cal.Rptr. 78] [abuse of discretion to base spousal support modification order on evidence that failed to establish changed circumstances].) Where child support orders are concerned, "contested factual issues . . . require an evidentiary hearing." (*In re Marriage of Hall, supra,* 81 Cal.App.4th at p. 320, fn. 7.) The procedures also require judicial findings when requested. (§ 3654; *In re Marriage of Wood* (1983) 141 Cal.App.3d 671, 681 [190 Cal.Rptr. 469].) As the above requirements suggest, the statutes contemplate that the determinations necessary to support a child support modification will be made by a judge, not simply left in the hands of parties equipped with a computer program. Thus, "it would constitute an abuse of discretion for the trial court simply to substitute the use of a computer program for the required consideration and appropriate weighing of the statutory factors." (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 9 [17 Cal.Rptr.2d 480]; see also *In re Marriage of Fini, supra,* 26 Cal.App.4th at p. 1043. Cf. *In re Marriage of Zywiciel, supra,* 83 Cal.App.4th at pp. 1081-1082 [improper to rely solely on computer program in setting permanent spousal support].)

The statutes also contemplate that the trial court will modify child support orders based on the parties' then current circumstances. For that reason, jurisdiction to make child support orders "is limited to the conditions and circumstances existing at the time they are made, and the court cannot then anticipate what may possibly thereafter happen and provide for future contingencies. [Citations.]" (*Primm v. Primm* (1956) 46 Cal.2d 690, 694 [299 P.2d 231]; accord, *In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 130; Cf. *In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 53; *In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 97.) Thus, insofar as it attempts to provide for future contingencies, the court's order is in excess of its jurisdiction.

We are also concerned that the court's approach will hamper effective judicial review of any resulting modification. Although the trial court reserved jurisdiction "over this procedure," only the $350,000 income ceiling

is expressly subject to a "challenge[] by either party in a motion based on the actual needs of the children and other applicable and legal factors at the time." To the extent it thwarts judicial review in the trial courts, the modification procedure is flawed. Our colleagues in the Fourth District recently observed that "making an order in an unreported chambers conference deprives the parents of their right under section 4057, subdivision (b) to have the family court at least *consider* whether the guideline result should be varied under the circumstances of their particular case." (*In re Marriage of Hall, supra,* 81 Cal.App.4th at p. 320, original italics.) If anything, the process envisioned here is even more vulnerable to criticism, since it would operate without any judicial supervision at all. Like our colleagues, we recognize "the need for explanation *by the trial court* when any of the variables bearing on child support *are* disputed, or when one of the parties contends that the case is appropriate for variation with the guideline as a matter of trial court discretion." (*Id.* at p. 320, fn. 7, first italics added, second italics in original.) "A logical corollary . . . is that *appellate courts* must have enough information in the record to evaluate whether a court correctly followed the formula guideline . . . or whether it abused its discretion in differing from it. . . . An adequate record on appeal is vital . . . ." (*Id.* at pp. 320-321, italics added; accord, *In re Marriage of Zywiciel, supra,* 83 Cal.App.4th at pp. 1082-1083 [spousal support].) While the modification approach ordered here may achieve the worthy goal of avoiding litigation, it does so at the cost of judicial supervision of a vitally important matter.

The challenged modification procedure cannot stand.

d. *Did the trial court err in refusing to make the child support retroactive to 1997?*

■ Iris challenges the trial court's refusal to make permanent child support retroactive to March 1997, when she first filed her modification motion.[18] In response, David initially asserts that Iris waived that claim by failing to specify the relevant portion of the court's statement of decision in her limited notice of appeal. However, as Iris correctly observes, her appeal is taken from the court's judgment, not from its statement of decision. Substantively, David contends that the trial court acted within its discretion in modifying child support retroactive only to January 1998.

---

[18]Pursuant to a stipulation filed in March 1995, David paid temporary child support of $2,171 per month. Iris moved for modification two years later, in March 1997. A ruling on Iris's motion was deferred until trial of the reserved issues, which finally took place in May 1998. In its amended statement of decision, the trial court ordered modified child support of $2,292, retroactive only to January 1998. As reasons for its refusal to make the change in support retroactive to the date of Iris's motion, the court noted that in 1997 "the parties were in the midst of their property division, had extensive attorney's fees and tax obligations, and [David] paid support . . . in accordance with the temporary support orders . . . ."

In analyzing this issue, we begin with the applicable statutes. As relevant here, section 3653 provides: "An order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date, except as provided in subdivision (b) or by federal law." (§ 3653, subd. (a); see also section 4009, which provides in pertinent part as follows: "Except as provided in Section 17402, an original order for child support may be made retroactive to the date of filing the petition, complaint, or other initial pleading." And see *County of Santa Clara v. Perry* (1998) 18 Cal.4th 435, 446 [75 Cal.Rptr.2d 738, 956 P.2d 1191].)

The statute thus permits the trial court to make its ruling retroactive to the filing date of the motion, but no earlier. In this case, of course, the trial court refused to go back even that far. According to Iris, that refusal constitutes an abuse of discretion. David disagrees. He argues that nothing in the court's findings suggests that the children's needs were unmet in 1997.

We have already discussed the flaws in the court's analysis of the children's needs. It also appears to us that the court erroneously based its analysis of the retroactivity question on the *parents'* situation in 1997—*their* property division, *their* attorneys' fees, *their* tax obligations. So far as we can glean from the record, the court did not independently assess the children's needs in acting on Iris's request for a fully retroactive support modification.

The amount of permanent child support ordered in this case is only slightly above the amount of temporary support ordered more than three years before, even though the trial court expressly recognized that the cost of living in the Bay Area had increased in the intervening years. The child support order thus fails to reflect any change in circumstances, even that caused by the mere passage of time. (Cf. *In re Marriage of Shupe* (1983) 139 Cal.App.3d 1026, 1036 [189 Cal.Rptr. 288] [affirming a modification based on a "finding that it costs more to support a child of 10 in 1981 than it did to support a child of 2 in 1973"].)

In exercising its discretion concerning retroactivity, the trial court was required to analyze the children's then current needs, as measured by the parents' ability to provide support. To the extent its focus was on the parents' expenses, rather than on the children's needs, the court abused its discretion.

e. *Did the trial court err by imputing income to Iris?*

█ In setting child support in this case, the trial court imputed earning capacity to Iris, who is the custodial parent and payee spouse. Iris challenges

the court's decision to impute income to her, on the ground that the court's decision is not in the children's best interests. David counters that the court's decision is supported both by evidence and by legal authority.

"It has long been the rule in this state that a parent's earning capacity may be considered in determining spousal and child support. [Citations.]" (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 642 [183 Cal.Rptr. 508, 646 P.2d 179].) "[F]or purposes of determining support, 'earning capacity' represents the income the spouse is reasonably capable of earning based upon the spouse's age, health, education, marketable skills, employment history, and the availability of employment opportunities." (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234 [14 Cal.Rptr.2d 411, 841 P.2d 931].)

Certainly, the record in this case contains substantial evidence of Iris's earning capacity, including expert testimony on the factors set forth above. (See, e.g., *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1338-1339 [66 Cal.Rptr.2d 393]; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 999-1000 [64 Cal.Rptr.2d 383]; cf. *In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 645.) Iris concedes that the evidence supports the court's factual determinations of her earning capacity.

Where a factual basis exists for imputing income based on earning capacity, as it does here, there is legal authority to do so. By express statutory provision, trial courts have discretion to impute income to a parent based on earning capacity. (§ 4058, subd. (b).) Case law also recognizes that discretion. (*In re Marriage of Simpson, supra,* 4 Cal.4th at p. 232; *In re Marriage of Hinman, supra,* 55 Cal.App.4th at pp. 998-999; see also *Moss v. Superior Court* (1998) 17 Cal.4th 396, 424 [71 Cal.Rptr.2d 215, 950 P.2d 59].) Recent decisions have even allowed courts to impute income to a payee spouse based on earning capacity. (*In re Marriage of Paulin* (1996) 46 Cal.App.4th 1378, 1384-1385 [54 Cal.Rptr.2d 314]; *In re Marriage of LaBass & Munsee, supra,* 56 Cal.App.4th at p. 1334.)

But no authority permits a court to impute earning capacity to a parent unless doing so is in the best interest of the children. By explicit statutory direction, the court's determination of earning capacity must be "consistent with the best interest of the children." (§ 4058, subd. (b); and see, e.g., *In re Marriage of LaBass & Munsee, supra,* 56 Cal.App.4th at pp. 1339, 1340; *In re Marriage of Hinman, supra,* 55 Cal.App.4th at p. 1000; *In re Marriage of Catalano, supra,* 204 Cal.App.3d at p. 555.)

In this case, the trial court made no express or implied finding that imputing earning capacity to Iris would be in the children's best interest. We

find it difficult to imagine how the children's interests are served by doing so, since the imputation of earning capacity to Iris effectively reduces overall monetary support for the children.[19] But we need not speculate on that question here, since the determination is properly left to the trial court on remand.

## 2. *Spousal Support.*

Iris also challenges the trial court's spousal support award on several grounds.

That award requires David to pay Iris $2,000 per month in permanent spousal support, effective June 1, 1998. Spousal support will terminate on September 30, 2002, unless a successful motion to extend is filed before then; support may terminate sooner if either party dies, or if Iris remarries, or if the court so orders. The award also contains an automatic reduction provision, which decreases the amount of spousal support in the event Iris has more than $50,000 in gross income from all sources in any year. For purposes of the reduction provision, Iris's income expressly includes her earning capacity. At the same time the court made its permanent spousal support order, it also ruled on Iris's motion for modification of temporary spousal support, increasing the amount from $689 to $2,000 per month, retroactive to January 1, 1998.

Before addressing Iris's specific challenges to the order entered in this case, we begin by setting forth the basic legal principles that control spousal support determinations.

Spousal support is governed by statute. (See §§ 4300-4360.) In ordering spousal support, the trial court *must* consider and weigh all of the circumstances enumerated in the statute, to the extent they are relevant to the case before it.[20] (See *In re Marriage of Zywiciel, supra,* 83 Cal.App.4th at p. 1081; accord, *In re Marriage of Watt* (1989) 214 Cal.App.3d 340, 347 [262

---

[19]We find no guidance on this question in either of the reported decisions in which earning capacity has been imputed to the payee spouse. In *In re Marriage of LaBass & Munsee, supra,* 56 Cal.App.4th at page 1334, the trial court granted the father a modification, which decreased his child support obligation from $567 to $342 per month as a result of imputing income to the mother. The Court of Appeal affirmed, without discussing how the decrease in support was in the best interests of the children. Similarly, in *In re Marriage of Paulin, supra,* 46 Cal.App.4th at pages 1384-1385, the court reduced the father's child support obligation, after allowing the father a hardship deduction and imputing income to the unemployed mother based on the salary she had previously earned. Again, however, there was no explanation of how the reduced support payment was in the best interests of the children.

[20]The applicable statute is section 4320, which provides as follows:

Cal.Rptr. 783] [decided under the predecessor statute];[21] see generally Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶¶ 6:835-6:838, pp. 6-300.2 to 6-300.4; 2 Kirkland et al., Cal. Family Law: Practice and Procedure, *supra*, Spousal Support Orders, § 51.30, pp. 51-20 to 51-20.1.) The first of the enumerated circumstances, the marital standard of living, is relevant as a reference point against which the other statutory factors are to be weighed. (*In re Marriage of Zywiciel, supra,* 83 Cal.App.4th at p. 1081; *In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 94; Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:838, pp. 6-300.3 to 6.300.4.) The other statutory factors include: contributions to the supporting spouse's education, training, or career; the supporting spouse's ability to pay; the

"In ordering spousal support under this part, the court shall consider all of the following circumstances:

"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:

"(1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.

"(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.

"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.

"(c) The ability to pay of the supporting party, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d) The needs of each party based on the standard of living established during the marriage.

"(e) The obligations and assets, including the separate property, of each party.

"(f) The duration of the marriage.

"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.

"(h) The age and health of the parties, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party where the court finds documented evidence of a history of domestic violence, as defined in Section 6211, against the supported party by the supporting party.

"(i) The immediate and specific tax consequences to each party.

"(j) The balance of the hardships to each party.

"(k) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties.

"(*l*) Any other factors the court determines are just and equitable."

[21]The predecessor statute was codified as former Civil Code section 4801. As relevant here, it was identical in all substantive respects to the current statute, except that the current provision includes two new factors for the court's consideration that were not contained in the predecessor statute: the balance of the hardships to each party, and the goal that the supported party will be self-supporting within a reasonable period of time. (§ 4320, subds. (j), (k).)

needs of each party, based on the marital standard of living; the obligations and assets of each party; the duration of the marriage; the opportunity for employment without undue interference with the children's interests; the age and health of the parties; tax consequences; the balance of hardships to the parties; the goal that the supported party be self-supporting within a reasonable period of time; and any other factors deemed just and equitable by the court. (§ 4320, subds. (b)-(*l*).)

 "In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it." (*In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 93.) In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. (*In re Marriage of Baker* (1992) 3 Cal.App.4th 491, 498 [4 Cal.Rptr.2d 553].) But the "court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities." (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 655 [235 Cal.Rptr. 587].) Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. (*In re Marriage of Watt, supra,* 214 Cal.App.3d at p. 347; *In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 425 [190 Cal.Rptr. 885].) Failure to do so is reversible error. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 479 [274 Cal.Rptr. 911]; *In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 47.)

With that background in mind, we turn to Iris's particular contentions regarding the spousal support order in this case.

a. *Did the court abuse its discretion in setting the amount of the award?*

 Iris takes issue with the amount of the permanent award, based on her claims that the trial court failed to follow section 4320 in several critical respects. First, Iris contends, the court failed to consider David's wealth in setting permanent spousal support at $2,000 per month.

(i) *Ability to pay.*

Under the statute, a key factor is the supporting party's "ability to pay," which encompasses assets as well as income. (§ 4320, subd. (c); *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 91, fn. 14 [154 Cal.Rptr. 413, 592

P.2d 1165]; *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 159 [18 Cal.Rptr.2d 743].) Thus, it is "proper for the court to look to assets controlled by husband, other than income, as a basis for the award [of spousal support]." (*In re Marriage of Dick, supra,* 15 Cal.App.4th at p. 160.) However, as one commentator has noted, "it remains highly unusual for a court to use assets more than income as a basis for determining [spousal] support." (2 Kirkland et al., Cal. Family Law: Practice and Procedure, *supra,* Spousal Support Orders, § 51.33[4], p. 51-27.)

In this case, David's assets include his stocks and options. The parties disagree about whether the 1997 stipulated judgment shields those assets from David's spousal support obligation. We need not resolve that question, however. For purposes of this appeal, we need only determine whether the trial court recognized David's ability to pay and applied that statutory factor in determining spousal support. We conclude that the court did not.

From the detailed statement of decision, it is apparent that the court was well aware of David's substantial assets. But it does not appear that the court took those assets into account or otherwise analyzed David's ability to pay spousal support in balancing the statutory factors. To the contrary, it seems clear that the court did not do so.[22] Failure to consider and apply the statutory factors constitutes an abuse of discretion. (*In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 479; *In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 47.) Ignoring the ability to pay is particularly egregious in this case, given the enormous financial disparity between the parties. (See *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667, 671-672 [143 Cal.Rptr. 94] [trial court abused its discretion in awarding inadequate spousal support, given parties' disparate living standards and prospects]; *In re Marriage of Ramer* (1986) 187 Cal.App.3d 263, 273 [231 Cal.Rptr. 647] [same]; see also *In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 30 [28 Cal.Rptr.2d 201]; cf. *In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 566, 568 [5 Cal.Rptr.2d 558] [disparate postseparation living standards not relevant where supported spouse's reasonable needs are met]; *In re Marriage of Zywiciel, supra,* 83 Cal.App.4th at p. 1081 [disparity in income alone does not justify spousal support award].)

---

[22]In its statement of decision, the court reviewed the history of the marriage, detailed each party's income and assets, discussed Iris's income and expense declarations, and analyzed the marital standard of living. After determining child support, the court said this: "On the issue of spousal support, the Court has set forth a number of findings above. The Court must now deal with the remaining applicable factors under Family Code [section] 4320." The court then considered and applied various statutory factors in light of the evidence presented. But nowhere in the court's ensuing discussion of spousal support is there any mention of David's ability to pay. Nor do any of the court's earlier findings suggest that it recognized David's wealth as a mandatory factor in setting spousal support.

Because we have no way to assess how the court's failure to consider David's ability to pay affected its determination of spousal support, we must remand the matter to the trial court with directions to consider all the applicable statutory factors, including David's ability to pay. In reconsidering the spousal support award, the court should also weigh the balance of hardships to the parties, including the disparity in their current living standards. (§ 4320, subd. (j).) The court may also consider other factors that it deems just and equitable under the circumstances presented here. (§ 4320, subd. (*l*).)

For the guidance of the court and parties on remand, we will discuss Iris's remaining contentions regarding spousal support.

### (ii) *Domestic contributions.*

 Iris raises several issues arising from the parties' respective family roles during their marriage. Iris first asserts that the trial court failed to consider how her domestic contributions during the marriage affected her career as an opera singer. (§ 4320, subd. (a)(2).) On this record, we cannot agree with that assertion. The court's findings demonstrate that it analyzed that statutory factor, but simply found no evidence that Iris's career had been curtailed as a result of the marriage. The record supports that finding. There was evidence of Iris's part-time work during the marriage, including some singing performances. Conversely, Iris offered no direct evidence that her domestic duties hampered her career. Given the state of the evidence, the court did not abuse its discretion in determining this issue adversely to Iris.

Iris also complains that the court failed to adequately consider how her role as the children's primary caretaker contributed to David's career development during the marriage. The court specifically found that Iris was the primary caretaker for the couple's four children. The court also specifically found that Iris did not contribute to the attainment of David's education, since he already had his doctoral degree when they married. The court found, moreover, that David was already a professor at the time of the marriage. For that reason, we are not troubled by the lack of a specific finding on the question of whether and to what extent Iris's role as the children's primary caretaker fostered David's career. (Cf. *In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 49.) The statute requires consideration of the supported party's contributions "to the attainment of an education, training, a career position, or a license by the supporting party." (§ 4320, subd. (b).) Here, the court impliedly determined that Iris did not contribute to the "attainment" of David's "career position" as a university professor.

(iii) *Marital standard of living.*

▇▇ Iris contends that the trial court erred both by understating the parties' marital standard of living and by limiting Iris to that standard after separation.

We cannot agree that the trial court abused its discretion in determining the marital standard of living. It appears that the court painstakingly evaluated evidence of the parties' income, expenses, and lifestyle during marriage in assessing the marital standard of living. We note that there is evidence that the family's standard of living was artificially low when compared with available income during marriage. And we acknowledge that a deliberately depressed marital lifestyle may justify setting spousal support at a level above the actual standard of living during marriage. (*In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 486.) In this case, however, it appears that the trial court appropriately accounted for certain abnormally low expenses in determining the marital standard of living.[23] We thus find no error in the process by which the court determined the marital standard of living.

We observe, however, that the marital standard of living is not the sole factor to consider in determining whether the supported spouse's reasonable needs have been met. (*In re Marriage of Smith, supra,* 225 Cal.App.3d at pp. 483, 484; see generally Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶¶ 6:945-6:967, pp. 6-338 to 6-348.) We further note that the trial court's findings in this case, though admirably detailed as to other points, do not specify Iris's actual monthly need for support. We might infer that the court determined Iris's needs to be $4,700 per month, based on its imputation to her of $2,700 in monthly income plus its award to her of $2,000 in monthly support. But it is unnecessary for us to draw inferences in this case, given our determination that remand is required. On remand, the court should determine and articulate Iris's reasonable needs. In doing so, the court should use the parties' marital standard of living as point of reference, giving that factor only such weight as the court deems appropriate under the circumstances.

---

[23]The court properly considered both expenses and income in determining the marital standard of living in this case. (Cf. *In re Marriage of Weinstein, supra,* 4 Cal.App.4th at p. 566.) With respect to expenses, the court noted evidence from David's accountant that put the family's expenses at $4,800 per month, as well as David's own estimate of monthly expenses of $6,000 per month. As to income, the court looked to David's tax returns for the year of separation and the three years prior in calculating the average family income of nearly $11,000 per month. (During the marriage, the couple's financial picture did not include the Cisco stock options, which David earned after separation.) Referring to all the evidence before it, the court set the marital standard of living at approximately $7,400 per month. Adjusting for David's absence from the household, the court subtracted $1,400 per month and thus established the marital standard of living at $6,000 per month.

We next consider Iris's claim that the court erred in limiting her to the marital living standard after separation. We reject that claim. Unquestionably, where the supporting party has the ability to pay, a trial court has discretion to award spousal support at a level above the actual marital standard of living. (*In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 48.) That is particularly true where, as here, the parties lived substantially below their means during marriage. (*In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 486, fn. 5.) But no authority compels the court to exercise that discretion by setting support above the marital standard of living. After weighing the statutory factors, "the trial court may fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." (*In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 475.) On remand, of course, the trial court has discretion to consider whether a spousal support award above the actual marital standard of living is warranted in this case to accomplish substantial justice between the parties, in light of Iris's needs and David's ability to pay.

b. *Was it error to impute income to Iris for purposes of setting spousal support?*

The trial court imputed earning capacity to Iris for purposes of spousal support. The court relied on the same evidence and used the same measure of earning capacity that it employed in setting child support. Iris contends that the court erred in doing so.

We previously analyzed the issue of earning capacity in our discussion of child support. For our purposes here, we need only repeat the long-standing rule that a trial court may consider earning capacity in determining spousal support, just as it may with child support. (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 642; see § 4320, subd. (a).) Unlike a child support order, however, a spousal support award does not require the court to consider the children's best interests. (Cf. § 4058, subd. (b).) Rather, it requires the trial judge to balance a number of different factors, as enumerated in the statute. (§ 4320.)

One of those factors is the statutory goal that the supported party will become self-sufficient within a reasonable time. (§ 4320, subd. (k).) In this case, the trial court accorded that factor great weight in balancing the various statutory considerations. It was entitled to do so; the weight to be given each statutory factor is within the trial court's broad discretion. (*In re Marriage of Baker, supra,* 3 Cal.App.4th at p. 498.) On this record, we cannot agree that

the trial court abused its broad discretion in setting spousal support by imputing income to Iris based on earning capacity.

 c. *Did the court abuse its discretion by incorporating an automatic reduction provision in the award?*

 The spousal support award in this case includes an automatic reduction provision. That "step-down" provision reduces Iris's spousal support by $1 for every $2 she receives in gross income over $50,000 per year. As defined in the judgment, for purposes of spousal support, Iris's gross income includes not only her actual and imputed earnings, but also the gross proceeds from any sale of options, stock, or other assets.

Iris contends that the trial court abused its discretion by including the step-down provision at issue here. According to Iris, the effect of that provision is to punish her in the event and to the extent she needs to sell stock or other assets received in the property division.

We first observe that step-down provisions are not per se objectionable. Such provisions are appropriately employed in some situations, consistent with the exercise of the trial court's broad discretion. (See, e.g., *In re Marriage of House* (1980) 106 Cal.App.3d 434, 437-438 [165 Cal.Rptr. 145] [affirming a step-down provision by which wife's award of "$300 per month to be reduced by $1 for every $2 earned by her over $250 per month"]; see also *In re Marriage of Paul* (1985) 173 Cal.App.3d 913, 916 [219 Cal.Rptr. 318, 63 A.L.R.4th 427] [involving a step-down provision by which wife's $700 award would be reduced "by $1 for every $2 of 'net earnings' earned by Wife from employment, for that portion in excess of $400 per month"]; and see generally Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶¶ 6:1069-6:1075, pp. 6-395 to 6-398.)

The step-down provisions in the cases cited above were based only on earnings. By contrast, the provision at issue here reduces the level of Iris's support for every dollar she receives over $50,000 in any given year, regardless of the source of the funds. Iris takes issue with the provision on that ground.[24]

Since the step-down provision applies without regard to how Iris generates her additional "gross income," the result is that Iris's spousal support

---

[24]Iris also challenges the provision because it applies without regard to her use of the funds. Iris claims she may need to raise money in order to pay attorneys' fees, to provide housing, or to elevate the children's standard of living. We recognize that the use to which Iris puts her funds may bear on her need for support. But we need not address that issue on this appeal, given our resolution of her challenge to the step-down provision on alternate grounds.

may decrease if she sells assets received in the marital property division. For that reason, this case necessitates "a delicate balancing procedure in which [the wife's] rights to full enjoyment of her separate property must be reconciled with [the husband's] rights not to be burdened by an open-ended obligation." (*In re Marriage of Kennedy, supra,* 193 Cal.App.3d at p. 1641.) In the *Kennedy* case, the trial court was found to have abused its discretion in imputing investment income on the separate property of the wife, who was the payee spouse, at a level beyond that supported by the factual record. (*Ibid.*) In another case, the court concluded that it "clearly would be unreasonable to expect [a wife] to sell her home in order to provide liquid assets to offset a reduction in spousal support paid by Husband, especially in the absence of a showing that Husband did not have the ability to make the required payments." (*In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 635-636 [120 Cal.Rptr. 654].) And in yet another case, a reviewing court found an abuse of discretion where the effect of the spousal support order was to penalize the wife "for receiving her fair share of the community property." (*In re Marriage of Rabkin, supra,* 179 Cal.App.3d at p. 1079.) In that case, the court said: "It makes no more sense to reduce wife's spousal support because she received her rightful share of the community property than it would to increase wife's spousal support because husband received his rightful share of the community property." (*Id.* at p. 1081; see also *In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1201 [280 Cal.Rptr. 565]; cf. *Sammut v. Sammut* (1980) 103 Cal.App.3d 557, 564 [163 Cal.Rptr. 193].) Here, a foreseeable consequence of the step-down provision is to punish Iris for transforming assets she received in the property division into cash.

We are mindful that the above decisions were made under the predecessor statute. Under former law, the objective of allowing the parties "to develop their lives free of obligations to each other"—though clearly a worthy one—was nevertheless "overshadowed by the primary goal of assuring that the supported spouse can provide for his or her reasonable needs. [Citation.]" (*In re Marriage of Kennedy, supra,* 193 Cal.App.3d at p. 1640.) Now, by contrast, one of the express statutory objectives is "that the supported party shall be self-supporting within a reasonable period of time." (§ 4320, subd. (k).) But even under former law, the courts considered self-sufficiency as a factor in the analysis. (*In re Marriage of Ostler & Smith, supra,* 223 Cal.App.3d at p. 49.)

In defense of the step-down provision, David asserts that it actually benefits Iris because it shields the first $50,000 of her income each year from the possibility of downward modification. We first observe that David's assertion is not borne out by the language of the judgment itself, which states that any failure on Iris's part to make reasonable good faith efforts to

become self-supporting within a reasonable period of time may be "considered by the Court as a basis for modifying or terminating support." Moreover, David's argument misses the point. The critical inquiry here is whether the step-down provision, standing alone, is supportable given the parties' circumstances at the time the order was made. For the reasons stated above, we find it is not. We will therefore remand with directions to the trial court to reconsider the step-down provision in light of the views expressed in this opinion.

d. *Did the court err in ordering support to terminate in September 2002?*

Pursuant to the trial court's order, Iris's spousal support will terminate on September 30, 2002, unless a motion to extend support is filed by that date. Iris challenges the order, claiming there is no evidence that she will be able to meet her own needs by the date set for termination of support. We reject Iris's challenge.

Contingent termination orders of this type, known as "*Richmond*" orders, properly serve to limit " 'the duration of support so that both parties can develop their own lives, free from obligations to each other . . . .' " (*In re Marriage of Richmond* (1980) 105 Cal.App.3d 352, 356 [164 Cal.Rptr. 381], quoting *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 452 [143 Cal.Rptr. 139, 573 P.2d 41].) A *Richmond* order may be appropriate "even upon the dissolution of a 'lengthy' marriage." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:1031, p. 6-370.) Where, as here, "it can reasonably be inferred from the evidence that the supported spouse is capable of self-support, such an award is deemed justified . . . ." (*Ibid.*)

The termination of spousal support in this case is not absolute. (Cf. *In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 467 [204 Cal.Rptr. 568, 683 P.2d 248].) In the event Iris is unable to support herself by the anticipated termination date, she may move to extend the support order. The order in this case is appropriately worded to permit her to do so. (See *In re Marriage of Carter* (1994) 26 Cal.App.4th 1024, 1030 [33 Cal.Rptr.2d 1].)

In short, the court did not abuse its discretion in making the contingent termination order in this case.

e. *Did the court err in refusing to modify temporary spousal support retroactive to 1997?*

As part of the judgment in this case, the trial court modified temporary spousal support, by increasing it from $689 to $2,000 per month,

retroactive to January 1998. Iris claims the court erred in refusing to modify support retroactive to March 1997, when she first filed her modification motion.

As we explained in our discussion of child support, the trial court has explicit statutory discretion to modify support retroactively. "An order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date, except as provided in subdivision (b) or by federal law." (§ 3653, subd. (a).)

That provision applies both to child support and to spousal support. Different policy considerations underlie each, however. (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:822, p. 6-296; see also *In re Marriage of Aninger, supra,* 220 Cal.App.3d at p. 243.) The overriding policy behind the child support statutes is to assure that children share in their parents' standard of living and have adequate support. (§ 4053, subds. (f), (*l*); Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:822, p. 6-296.) By contrast, the "purposes of spousal support inevitably vary from case to case, depending upon the parties and the facts and circumstances of the case." (*In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 480.) "The facts and the equities in one case may call for no spousal support, or for very short-term support . . . . At the other end of the spectrum are cases where the purpose of spousal support is to provide financial assistance to the supported spouse until . . . death . . . . In between are the myriad of factual circumstances which the trial court must consider in making its order for purposes which vary from case to case." (*Id.* at pp. 480-481.)

Given the variety of purposes to be served by spousal support, it follows that the trial court must be invested with broad discretion in fashioning such awards. As we explained above, the court's discretion in setting permanent support is constrained by the enumerated statutory factors. By contrast, there are no explicit statutory standards governing temporary support. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:828, p. 6-299, and authorities cited therein.) Nor are there explicit statutory standards controlling decisions about retroactivity. Absent statutory direction, the trial court's exercise of its discretion regarding retroactivity of temporary support must be guided by two overriding concerns: the supported spouse's need and the supporting spouse's ability to pay. In short, "the trial court should tailor its award on the basis of the equitable rights of the parties in light of their economic needs and abilities" during the period for which a retroactive increase is sought. (*In re Marriage of Jacobs, supra,* 126 Cal.App.3d at p.

836 [trial court abused its discretion in refusing to modify spousal support retroactively following remittitur in first appeal].)

In this case, the court apparently recognized that Iris required $2,000 in monthly support from David in order to meet her reasonable needs. Yet she was receiving only $689 from him each month in temporary support, a shortfall of more than $1,300 monthly. The court had discretion to alleviate this shortfall by increasing spousal support retroactive to March 1997, the date of Iris's modification motion. It did not do so. Nor did the court articulate the reasons for its decision not to do so. (See *In re Marriage of Rising* (1999) 76 Cal.App.4th 472, 474 [90 Cal.Rptr.2d 380] [trial court's failure to explain its reasons for step-down constituted reversible error]; cf. *In re Marriage of Weinstein, supra,* 4 Cal.App.4th at p. 570 [where the statement of decision failed to explain reasons for ruling on retroactivity, and no objection was made below, the reviewing court implied findings to support the judgment].)

We might infer that the court's decision to limit retroactivity was based on Iris's 1997 exercise of options and sale of stock, which provided her with an infusion of funds that year. We decline to indulge that inference here, however, for two reasons. First, the evidence in the record shows that Iris did not exercise her options until December of 1997. Nor did the parties agree to their property division until December 1997. Second, and more importantly, such an inference runs counter to the principle that a supported party should not be compelled to invade principal assets to provide for his or her own reasonable support, where the supporting party is able to pay. (Cf. *Sammut v. Sammut, supra,* 103 Cal.App.3d at p. 564.)

On this record, both David's ability to pay and Iris's need for support in 1997 seem evident. Despite that, the trial court refused to modify spousal support retroactive to the date of Iris's motion in March 1997. Nor did it explain its reasons for doing so. In the absence of articulated reasons, we cannot ascertain whether the court exercised its discretion along legal lines, with due consideration for the parties' respective economic needs and abilities during the entire period for which modification was sought. (Cf. *In re Marriage of Jacobs, supra,* 126 Cal.App.3d at p. 834 [failure to modify spousal support retroactively as an abuse of discretion]; *In re Marriage of Rising, supra,* 76 Cal.App.4th at p. 474 [failure to articulate reasons as an abuse of discretion].) We therefore remand the question of retroactivity of spousal support to the trial court for its reconsideration.

3. *Attorneys' Fees.*

■ Iris asserts that the trial court abused its discretion in refusing to award her attorneys' fees following trial.[25] In pressing her claim of error, Iris points out the enormous disparity in income and assets between the parties.

■ In assessing Iris's claim, we start by acknowledging that trial courts enjoy broad discretion in awarding attorneys' fees in marital proceedings. (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768 [209 Cal.Rptr. 354, 691 P.2d 1020].) The exercise of that discretion is guided by statute. As relevant here, the statute permits an award of attorneys' fees and costs where "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).)[26] "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately . . . ."

---

[25]By the time of trial on the reserved issues in May 1998, it appears that David had already paid more than $94,000 in attorneys' fees for Iris. By stipulation, the trial court had discretion to award fees only for the period after November 20, 1997, and only up to a maximum of $50,000. Iris requested need-based fees under section 2030; David sought fees as a sanction pursuant to section 271. David has not appealed the denial of his fee request.

[26]In its entirety, section 2032 provides as follows:

"(a) The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.

"(b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances.

"(c) The court may order payment of an award of attorney's fees and costs from any type of property, whether community or separate, principal or income.

"(d) Either party may, at any time before the hearing of the cause on the merits, on noticed motion, request the court to make a finding that the case involves complex or substantial issues of fact or law related to property rights, visitation, custody, or support. Upon that finding, the court may in its discretion direct the implementation of a case management plan for the purpose of allocating attorney's fees, court costs, expert fees, and consultant fees equitably between the parties. The case management plan shall focus on specific, designated issues. The plan may provide for the allocation of separate or community assets, security against these assets, and for payments from income or anticipated income of either party for the purpose described in this subdivision and for the benefit of one or both parties. Payments shall be authorized only on agreement of the parties or, in the absence thereof, by court order. The court may order that a referee be appointed pursuant to Section 639 of the Code of Civil Procedure to oversee the case management plan."

(§ 2032, subd. (b).) "A *disparity* in the parties' respective circumstances may itself demonstrate relative 'need' even though the applicant spouse admittedly has the funds to pay his or her fees." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 14:159, p. 14-41, original italics; see § 2032, subd. (b); *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 881-883 [69 Cal.Rptr.2d 480].)

"It is well established in California that, although the trial court has considerable discretion in fashioning a need-based fee award [citation], the record must reflect that the trial court actually exercised that discretion, and considered the statutory factors in exercising that discretion." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 827 [53 Cal.Rptr.2d 179], fn. omitted.) Thus, "it is an abuse of discretion for trial courts to deny motions for pendente lite attorney fees and costs in marital dissolution proceedings without considering the needs of the requesting spouse and the ability to pay of the spouse against whom the award is sought." (*In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213, 1215 [215 Cal.Rptr. 789].) Similarly, trial courts "have a *duty* at the conclusion of the case to make a just and reasonable award of attorney fees and costs, considering the circumstances of the parties." (*In re Marriage of Green* (1992) 6 Cal.App.4th 584, 593 [7 Cal.Rptr.2d 872], italics added.)

 In this case, the trial court denied Iris's request for need-based fees because it found a "significant absence of proof on the issues." In light of the court's reasons for denying fees, we review in detail both the proof offered below and the manner of its submission.

On the day of trial, Mr. Danaher, Iris's trial attorney, filed a declaration regarding fees. Although that declaration referred to an attached summary of fees and costs, the summary apparently was omitted. As the trial court later noted, the declaration as filed failed to show "the amount of fees incurred, the costs, the time expended, or even the hourly rates of counsel." However, Mr. Danaher's declaration also offered: "If the Court requires any more detail I'll be available to testify as to the expenditure of time on this case."

In its initial statement of decision, filed 10 days after trial, the court denied Iris fees and costs, citing "a significant absence of proof on the issues." The following day, Iris filed a second declaration in support of her request for fees, this one signed by Mr. Ottenweller, her other trial counsel. In a letter to the trial judge, David's attorney, Mr. Baugh, objected to Mr. Ottenweller's declaration as untimely. Acting on Iris's behalf, Mr. Danaher responded with his own letter to the trial judge, in which he explained that his cocounsel did not understand that the fee matter stood submitted at the

conclusion of trial. Along with his letter, Mr. Danaher enclosed a second declaration regarding his own fees, which he asked the court to consider; that second declaration included substantial time and billing detail. In addition to the declarations and correspondence already mentioned, the record on appeal includes additional posttrial correspondence to the court by both sides regarding the submission of fee evidence.

Despite the barrage of posttrial letters and documentation, the trial court apparently did not consider any of the evidence that Iris submitted following the hearing. It may be that the court viewed those submissions as tardy and declined to consider them for procedural reasons. But we cannot know that, because the court did not articulate its reasons for rejecting Iris's posttrial proof of her attorneys' fees.[27]

From what we can glean, it appears that practices vary widely with respect to fee request submissions. (See, e.g., *In re Marriage of Braud, supra,* 45 Cal.App.4th at p. 826 [trial court invited posttrial fee declaration, which was submitted 10 days after trial and then supplemented more than seven months later]; cf. Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 14:204, pp. 14-48.6 to 14-49 [in a contested trial, "[r]equest for a need-based attorney fees and costs award should be made upon conclusion of the client's cases in chief and before counsel rests. Supporting evidence will usually be taken at that point and the matter decided along with all other issues in the case." (Italics omitted.)]; cf. 2 Kirkland et al., Cal. Family Law: Practice and Procedure, *supra,* Attorney's Fee Awards, § 62.05[3][a], pp. 62-32.2 to 62-32.3 ["Direct evidence of the reasonable value of an attorney's services need not be presented because the evidence is necessarily before the court that hears the case. If the trial court is informed of the extent and nature of the services rendered, it may rely on its own experience and knowledge in determining their reasonable value. [¶] . . . [¶] In cases when the proceeding is contested or involves complex issues, detailed evidence of the legal work performed and the expenses and costs incurred should be presented. Counsel should be prepared at the hearing to support the request for fees and costs with such evidence. In some cases, it may be sufficient if counsel testifies as to the number of hours spent and his or her hourly rate." (Fns. omitted.)]; see also Cal. Civil Practice: Family Law Litigation (1997) Attorney Fees and

---

[27]The court apparently declined David's invitation to put the procedural dispute to rest by formal order. When the dispute arose after trial, David's attorney submitted a proposed order to the court, clarifying that the fee issue was closed at the end of the hearing. But there is no indication in the record that the court ever signed that order. Nor did the court discuss the procedural aspects of the fee issue in its amended statement of decision. However, it did state: "The issue of fees was clearly submitted by the parties and their counsel on written declarations. Neither side has produced sufficient evidence upon which to base an award of fees, either under section 271 or under 2030."

Costs, § 10:13, pp. 16-17; and see Super. Ct. Santa Clara County, Local Rules, rule 3.4, A. ["Any party requesting attorney's fees (either pendente lite or post judgment) should use the Attorney's Fee Request face sheet completed so far as the party is able. [¶] The parties shall not attach billing statements to the request, but shall exchange billing statements prior to the hearing or submission of the attorney's fees request. Counsel should bring copies of the bills to the hearing in case the Court desires to see the copies, or otherwise provide copies if requested by the Court."].) Even in this particular case, the procedure for submitting proof of fees apparently was not established prior to trial; rather, it was the subject of some discussion at the hearing itself.[28]

We appreciate the need for trial judges to control the cases before them, particularly in the busy family courts. We also understand the benefit of maintaining settled procedural rules and standards.

In this case, however, the state of the record as it relates to the submission of proof concerns us. For one thing, the record is ambiguous as to whether the parties were in fact compelled to submit proof of fees before the close of trial. But even assuming that the parties were required to do so, it appears that Iris's counsel attempted to proffer adequate evidence the day of the hearing, through his offer of testimony in support of Iris's request for fees, and possibly through the missing attachment to his declaration. Finally, even assuming that the evidentiary hearing was plainly and properly closed, the

---

[28]At the start of trial, this exchange took place between the court and counsel:

"The Court: My understanding that the issues before the Court today are child and spousal support; that attorney's fees may or may not also be an issue, but am I correct that's going to be submitted subsequently?

"Mr. Baugh [David's attorney]: We didn't—no. I was ready to submit it today, but I customarily submit it at the end of the case. It can be in a sealed envelope if the Court wishes.

"The Court: And Mr. Danaher, you have the attorney's fees documents here today?

"Mr. Danaher [Iris's attorney]: Yes."

During a recess partway through trial, Iris's counsel sought to submit his fee declaration along with a supplemental trial brief containing updated income and expense information. The court asked why the information had not been submitted earlier, which prompted this exchange:

"Mr. Danaher: It wasn't submitted because it wasn't done.

"The Court: I recognize it wasn't.

"Mr. Danaher: Well, on the attorneys' fees—

"The Court: The attorney's fees I'm not questioning."

Later in that same exchange, this colloquy took place:

"Mr. Baugh: You want our attorney's fees declarations now?

"The Court: You can submit them. I'm not going to look at them until the end of the case. The Court will bifurcate that issue from the other issues."

Finally, at the end of the day, the Court said this: "Counsel, the Court notes it's two minutes after five. The Court is now going to deem the matter submitted except for the issue of attorney's fees which we've submitted in writing."

court had discretion to reopen it. (See *In re Marriage of Olson* (1980) 27 Cal.3d 414, 422 [165 Cal.Rptr. 820, 612 P.2d 910].) Under these circumstances, it would be an abuse of discretion to decline to reopen the trial to take the evidence of fees. (*Ibid.*; cf. *In re Marriage of Leff* (1972) 25 Cal.App.3d 630, 647 [102 Cal.Rptr. 195].)

In addition to its troubling procedural aspects, the denial of fees in this case implicates strong public policy concerns. There is no question that access to the family law courts through adequate representation is critical. (*In re Marriage of Sullivan, supra,* 37 Cal.3d at p. 768; *In re Marriage of Hatch, supra,* 169 Cal.App.3d at p. 1219.) Judicial access is particularly vital where child support issues are concerned. (See, e.g., *In re Marriage of Joseph* (1990) 217 Cal.App.3d 1277, 1284-1285 [266 Cal.Rptr. 548].)

In ruling on a need-based request for fees, a trial court is required to actually exercise its discretion. (*In re Marriage of Braud, supra,* 45 Cal.App.4th at p. 827.) The court has a duty to make a just and reasonable award of attorneys' fees and costs, if warranted under the circumstances of the case before it. (*In re Marriage of Green, supra,* 6 Cal.App.4th at p. 593.) Most significantly here, those circumstances include Iris's need for representation and David's ability to pay her attorneys' fees. (See § 2030, subd. (a); *In re Marriage of Sullivan, supra,* 37 Cal.3d at p. 768.) Other factors may include " ' " 'the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience . . . and the time consumed. [Citations.]' " '[Citations.]" (*In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1523 [14 Cal.Rptr.2d 1].) In this particular case, the court was also required to give effect to the parties' agreement concerning the period for which fees were to be considered and the maximum amount of any award.

The court's statement of decision recites that it considered the relevant circumstances here. But its decision clearly was based on its determination that Iris had failed to carry her burden of proof.

Given the procedural record before us, as well as the important public policy considerations at stake, we conclude that the court abused its discretion by refusing to consider the fee request on its merits. (Cf. *In re Marriage of Popenhager, supra,* 99 Cal.App.3d at pp. 525-526.) We therefore remand the matter of attorneys' fees and costs to the trial court for its reconsideration and determination on the merits.

### DISPOSITION

We reverse the judgment and we remand the matter to the trial court with the following instructions.

1. *Child Support.*

We strike that portion of the judgment that provides for future modification of child support. We reverse that portion of the judgment that sets child support and we remand the issue of child support to the trial court for its reconsideration consistent with these instructions:

In calculating David's gross income for purposes of section 4058, subdivision (a)(1), the court shall include the entire gross proceeds from David's 1997 sale of his Cisco stock, after accounting for allowable deductions. In the exercise of its discretion, the trial court may determine the proper allocation of those stock sale proceeds over time as appropriate. In calculating David's gross income, the court also shall include David's income from royalties, dividends, and interest, if previously omitted and according to proof.

In setting support, the court shall consider imputing reasonable return on David's assets, pursuant to section 4058, subdivision (b), to the extent necessary to meet the children's reasonable needs. If appropriate, the court shall consider whether guideline support, as so calculated, exceeds the reasonable needs of the children under section 4057.

To the extent that the amount of child support depends on the children's needs, the court shall determine those needs by reference to the parents' ability to pay support, not by the children's historic expenses. The court shall determine the children's needs without regard to the parties' agreement capping housing costs. Likewise, the court shall determine the children's needs without taking into account any contribution from the trust absent sufficient evidence that the trust is actually satisfying some of those needs.

The court shall reconsider whether child support should be modified retroactive to the date of Iris's motion, basing its determination on the children's needs and David's ability to pay.

The court shall consider whether imputing earning capacity to Iris is in the children's best interest and shall make appropriate findings on that question.

2. *Spousal Support.*

We reverse the judgment as it relates to spousal support and remand the matter to the trial court with these instructions:

The trial court shall consider all the applicable statutory factors under section 4320, including David's ability to pay. In reconsidering the spousal

support award, the court should weigh the balance of hardships to the parties, including the disparity in their current living standards. The court may consider any other factors that it deems just and equitable under the circumstances presented here.

The court shall determine and articulate Iris's reasonable needs for support. In doing so, the court should use the parties' marital standard of living as point of reference, giving that factor only such weight as the court deems appropriate under the circumstances. The trial court has discretion to consider whether a spousal support award above the actual marital standard of living is warranted in this case to accomplish substantial justice between the parties, in light of Iris's needs and David's ability to pay.

With respect to the step-down, the court shall reconsider that provision, giving due regard to its effect on Iris's ability to enjoy her separate property assets.

On the question of retroactivity of temporary spousal support, the trial court shall reconsider its order in light of David's ability to pay and Iris's need for support in 1997.

3. *Attorneys' Fees.*

We reverse the trial court's denial of fees and remand for its reconsideration of Iris's request for attorneys' fees and costs on the merits. In considering that request, the court shall consider Iris's needs and David's ability to pay, together with all other appropriate factors, including the parties' stipulation.

Iris shall have costs on appeal. Iris may be awarded appellate attorneys' fees in the trial court's discretion, upon an appropriate motion in that court.

Bamattre-Manoukian, Acting P. J., and Premo, J., concurred.

A petition for a rehearing was denied October 12, 2001, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 19, 2001.